**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION** <br> 600 Pennsylvania Avenue, NW <br> Washington, DC 20580 <br><br> and <br><br> **STATE OF RHODE ISLAND** <br> Office of the Attorney General <br> 150 South Main Street <br> Providence, RI 02903 <br><br> Plaintiffs, <br><br> v. <br><br> **LIFESPAN CORPORATION** <br> 167 Point Street <br> Providence, RI 02903 <br><br> and <br><br> **CARE NEW ENGLAND HEALTH SYSTEM** <br> 4 Richmond Square <br> Providence, RI 02906 <br><br> Defendants. | **REDACTED COPY** <br><br><br> Civil Action No. 1:22-cv-00081 |

**COMPLAINT FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION PURSUANT TO
SECTION 13(b) OF THE FEDERAL TRADE COMMISSION ACT**

The Federal Trade Commission ("FTC" or "Commission") and the State of Rhode Island,

acting by and through its Office of the Attorney General (collectively, "Plaintiffs"), petition this

Court, pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C.

-1-

§ 53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26, to enter a stipulated temporary restraining order and grant a preliminary injunction enjoining Defendant Lifespan Corporation ("Lifespan") and Defendant Care New England Health System ("CNE," and together with Lifespan, "Defendants"), including their agents, divisions, parents, subsidiaries, affiliates, partnerships, or joint ventures, from consummating Defendants' proposed merger.  The merger is pursuant to a Definitive Agreement, dated February 23, 2021, whereby Lifespan and CNE will consolidate their separately controlled assets under common control (the "Proposed Transaction").  Absent such provisional relief, Defendants will be free to consummate the Proposed Transaction after 11:59 p.m. on February 22, 2022.

Plaintiffs require the aid of this Court to maintain the *status quo* and to prevent interim harm to competition during the pendency of an administrative trial on the merits.  The Commission has already initiated the administrative proceeding, pursuant to Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and Section 5 of the FTC Act, 15 U.S.C. § 45, by filing an administrative complaint on February 17, 2022.  Pursuant to FTC regulations, the administrative proceeding on the merits will begin on July 20, 2022.  The administrative proceeding will determine the legality of the Proposed Transaction and will provide all parties a full opportunity to conduct discovery and present testimony and other evidence regarding the likely competitive effects of the Proposed Transaction.

## I.

## NATURE OF THE CASE

1.      This action is to preliminarily enjoin Defendants' anticompetitive merger.  The Proposed Transaction is likely to substantially lessen competition in Rhode Island for inpatient general acute care ("GAC") hospital services sold and provided to commercial insurers and their

-2-

members ("inpatient GAC hospital services") and inpatient behavioral health services sold and provided to commercial insurers and their members ("inpatient behavioral health services") in violation of Section 7 of the Clayton Act.

2.      Lifespan and CNE are the first and second largest healthcare providers in the state of Rhode Island.  Lifespan's and CNE's inpatient GAC hospitals overlap significantly in the medical, surgical, and diagnostic services they offer that require an overnight hospital stay. These overlapping services account for the majority of inpatients the Defendants treat.  Further, Lifespan and CNE operate the only two standalone inpatient behavioral health facilities in Rhode Island.

3.      Currently, Lifespan and CNE are close competitors and frequently refer to each other with terms like "█████████" and "█████████████" or "███████████████," both internally and to third parties.

4.      Defendants compete to sell inpatient GAC services and inpatient behavioral health services to commercial insurers and to provide these services to commercial insurers' members.  This competition has spurred Defendants to invest in clinical services, access, and quality, to the benefit of all Rhode Island residents.  CNE has added services at its Kent hospital, noting they would "█████████████████████████"  Similarly, Lifespan has improved access because █████████████████████████████"

5.      The Proposed Transaction would eliminate this competition and create a dominant health system controlling most inpatient GAC services and inpatient behavioral health services in Rhode Island.  If this merger is allowed to proceed, Defendants would control at least 70 percent of the markets for inpatient GAC hospital services and inpatient behavioral health services.

6.      If allowed to consummate, the Proposed Transaction would significantly increase market concentration in already highly concentrated markets.  Under the thresholds established by the 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("2010 Merger Guidelines"), the Proposed Transaction is presumptively illegal in the markets for inpatient GAC services and inpatient behavioral health services in Rhode Island. Even including hospitals located in the 19 Massachusetts towns bordering Rhode Island, Defendants would still exceed the 2010 Merger Guidelines thresholds in each market; therefore, the Proposed Transaction is presumptively illegal.

7.      Preliminary injunctive relief restraining Defendants from proceeding with the Proposed Transaction is necessary to prevent interim harm to competition during the Commission's ongoing administrative trial.  Preliminary relief will ensure that Defendants cannot close the Proposed Transaction and combine Lifespan's and CNE's operations during the pendency of the Commission's administrative process. Were Defendants to consummate the Proposed Transaction, the Commission's ability to fashion effective relief would be significantly impaired, or even precluded, if the Proposed Transaction is found to be unlawful after a full administrative trial on the merits and any subsequent appeals.

8.      The Commission and Defendants have stipulated to the Court's entry of a temporary restraining order preventing Defendants from consummating the acquisition until after 11:59 p.m. EST on the tenth business day after this Court rules on a motion for a preliminary injunction or until after a date set by the Court.  Such a temporary restraining order is necessary to preserve the *status quo* and protect competition while the Court considers Plaintiffs' application for a preliminary injunction.

## II.

## JURISDICTION AND VENUE

9.      This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C.

§ 53(b); Section 16 of the Clayton Act, 15 U.S.C. § 26; and 28 U.S.C. §§ 1331, 1337, and 1345.

This is a civil action arising under Acts of Congress protecting trade and commerce against

restraints and monopolies and is brought by an agency of the United States authorized by an Act

of Congress to bring this action.  Lifespan, CNE, and their relevant operating entities and

subsidiaries, are, and at all relevant times have been, engaged in activities in or affecting

"commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the

Clayton Act, 15 U.S.C. § 12.  Defendants also are, and at all relevant times have been, engaged

in commerce in the State of Rhode Island.

10.      Lifespan and CNE transact business in the District of Rhode Island and are

subject to personal jurisdiction therein.  Both Lifespan's and CNE's principal places of business

are in Providence, which is in the District of Rhode Island.  Venue, therefore, is proper in this

district under 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. § 53(b).

11.      Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

(b)      Whenever the Commission has reason to believe –

> (1) that any person, partnership, or corporation is violating,
> or is about to violate, any provision of law enforced by the
> Federal Trade Commission, and
>
> (2) that the enjoining thereof pending the issuance of a
> complaint by the Commission and until such complaint is
> dismissed by the Commission or set aside by the court on
> review, or until the order of the Commission made thereon
> has become final, would be in the interest of the public –
> the Commission by any of its attorneys designated by it for
> such purpose may bring suit in a district court of the United

> States to enjoin any such act or practice.  Upon a proper
> showing that, weighing the equities and considering the
> Commission's likelihood of ultimate success, such action
> would be in the public interest, and after notice to the
> defendant, a temporary restraining order or a preliminary
> injunction may be granted without bond . . . .

12.     In conjunction with the Commission, the State of Rhode Island brings this action

for a preliminary injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and

restrain Lifespan and CNE from violating Section 7 of the Clayton Act, 15 U.S.C. § 18, pending

the Commission's administrative proceeding.  The State of Rhode Island has the requisite

standing to bring this action because the Proposed Transaction would cause antitrust injury in

Rhode Island for inpatient GAC hospital services and inpatient behavioral health services.

13.     Section 16 of the Clayton Act, 15 U.S.C § 26, provides in pertinent part:

> Any person, firm, corporation, or association shall be entitled to sue for
> and have injunctive relief, in any court of the United States having
> jurisdiction over the parties, against threatened loss or damage by a
> violation of the antitrust laws, including section 13, 14, 18 and 19 of this
> title, when and under the same conditions and principles as injunctive
> relief against threatened conduct that will cause loss or damage is granted
> by courts of equity, under the rules governing such proceedings, and upon
> the execution of proper bond against damages for an injunction
> improvidently granted and a showing that the danger of irreparable loss or
> damage is immediate, a preliminary injunction may issue . . . .

14.     The Proposed Transaction constitutes a transaction subject to Section 7 of the

Clayton Act, 15 U.S.C § 18.

## III.

## BACKGROUND

### A.

### The Parties

15.    Plaintiff Federal Trade Commission is an administrative agency of the United States government established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq.*, with its principal offices at 600 Pennsylvania Avenue, NW, Washington, District of Columbia 20580.  The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

16.    Plaintiff Rhode Island is a sovereign state of the United States.  This action is brought by and through its Attorney General, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State of Rhode Island pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.  The Office of the Attorney General of the State of Rhode Island has its principal offices at 150 South Main Street, Providence, RI 02903.

17.    Defendant Lifespan, the largest healthcare provider in Rhode Island based on inpatient GAC admissions, is a not-for-profit health system with a principal place of business in Providence, Rhode Island.  Lifespan operates three inpatient GAC hospitals, Rhode Island's only dedicated children's hospital, and a freestanding behavioral health hospital.  Lifespan's Rhode Island Hospital is the largest hospital in the state and is located in downtown Providence, Rhode Island and shares a campus with Lifespan-owned Hasbro Children's Hospital and CNE-owned Women & Infants Hospital.  In addition to these facilities, Lifespan operates two other GAC hospitals in Rhode Island – The Miriam Hospital ("Miriam") on the East Side of Providence and

Newport Hospital ("Newport") in Newport.  Lifespan's behavioral health hospital ("Bradley") is located in East Providence, Rhode Island.  Lifespan has 1,165 licensed beds across all its locations.  Lifespan employs or affiliates with over 900 primary and specialty care physicians.  Through a for-profit joint venture, Lifespan operates the Lifespan Health Alliance, an accountable care organization ("ACO") comprised of the three Lifespan hospitals and approximately 2,100 physicians.  Lifespan is the largest private employer in Rhode Island with nearly 16,000 employees, including approximately 3,370 registered nurses.  In fiscal year 2021, Lifespan generated approximately $2.8 billion in revenue and approximately $89.1 million in operating income.

18.     Defendant CNE is a not-for-profit community-based health system made up of two inpatient GAC hospitals and a freestanding behavioral health hospital.  CNE's principal place of business is in Providence, Rhode Island.  CNE's Women & Infants GAC hospital and CNE's behavioral health hospital, Butler Hospital ("Butler"), are located in downtown Providence and the East Side of Providence, respectively.  CNE's Kent County Hospital ("Kent") is the second-largest GAC hospital in Rhode Island and is located in Warwick.  CNE has 749 licensed beds across all its locations.  CNE employs approximately 442 healthcare providers and, through its ACO, Integra, CNE closely affiliates with an additional 240 primary care providers.  CNE employs approximately 1,950 registered nurses.  In fiscal year 2021, CNE garnered approximately $1.25 billion in revenue and approximately $16.2 million in operating income.

## B.

### The Proposed Transaction and the Commission's Response

19.     On February 23, 2021, Lifespan and CNE signed an agreement to combine into a new Rhode Island nonprofit corporation.

20.     Pursuant to the Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. § 18a, and a timing agreement entered into between Defendants and Commission staff, absent this Court's action, Defendants would be free under federal law to close the Proposed Transaction after 11:59 p.m. EST on February 22, 2022.

21.     Following a thorough investigation, the Commission, on February 17, 2022, and by a 4-0 vote, found reason to believe that the Proposed Transaction would violate Section 7 of the Clayton Act and initiated an administrative proceeding on the antitrust merits of the Proposed Transaction before an Administrative Law Judge.  The merits trial will begin on July 20, 2022. The administrative proceeding provides a forum for all parties to conduct discovery, followed by a merits trial with up to 210 hours of live testimony.  The decision of the Administrative Law Judge is subject to appeal to the full Commission, which, in turn, is subject to judicial review by a United States Court of Appeals.

22.     The FTC and the State of Rhode Island are initiating this proceeding under Section 13(b) of the FTC Act and Section 16 of the Clayton Act to obtain preliminary injunctive relief pending the outcome of the Commission's administrative proceeding.

## IV.

### THE RELEVANT HEALTHCARE SERVICE MARKETS

23.     The Proposed Transaction is likely to substantially lessen competition in two service markets sold and provided to commercial insurers and their members in Rhode Island:

(1) inpatient GAC hospital services; and (2) inpatient behavioral health services (collectively "Healthcare Service Markets").  Hospitals compete on rates offered to commercial insurers to achieve "in-network" status.  For each Healthcare Service Market, a hypothetical monopolist profitably could impose a small but significant and non-transitory increase in price ("SSNIP").  Because commercial insurers would accept a SSNIP rather than market a network to employers and individuals that omitted inpatient GAC hospital services and would accept a SSNIP rather than market a network that omitted inpatient behavioral health services, each of these Healthcare Service Markets constitutes a relevant market for analyzing the Proposed Transaction.

## A.

## Inpatient GAC Hospital Services

24.     Inpatient GAC hospital services sold and provided to commercial insurers and their members is a relevant market in which to analyze the Proposed Transaction.  Inpatient GAC hospital services include a broad cluster of hospital services—medical, surgical, and diagnostic services requiring an overnight hospital stay—offered by both Lifespan and CNE and for which competitive conditions are substantially similar.  Here, inpatient GAC hospital services include all overlapping inpatient primary, secondary, and tertiary services offered by Lifespan and CNE.  Non-overlapping services are not included in the relevant market.

25.     Although the Proposed Transaction's likely effect on competition could be analyzed separately for each individual inpatient GAC hospital service, it is appropriate to evaluate the Proposed Transaction's likely effects across this cluster of inpatient GAC hospital services because these services are offered to patients under similar competitive conditions.  Thus, grouping the hundreds of individual, overlapping inpatient GAC hospital services into a

cluster for analytical convenience enables the efficient evaluation of competitive effects without forfeiting the accuracy of the overall analysis.

26.    Outpatient services are not included in the inpatient GAC hospital services market because commercial insurers and patients cannot substitute outpatient services for inpatient services in response to a price increase for inpatient GAC hospital services.  Additionally, outpatient services are offered by a different set of competitors under different competitive conditions than inpatient GAC hospital services.

27.    The inpatient GAC hospital services market does not include services related to psychiatric care, substance abuse, or rehabilitation services.  These services are offered by a different set of competitors under different competitive conditions than inpatient GAC hospital services.

## B.

### Inpatient Behavioral Health Services

28.    Inpatient behavioral health services sold and provided to commercial insurers and their members is a relevant market in which to analyze the Proposed Transaction.  Inpatient behavioral health services include a cluster of inpatient services that treat, among other conditions, depressive disorders, personality disorders, and eating disorders, offered by both Lifespan and CNE and for which competitive conditions are substantially similar.  Further, narrower relevant markets may exist for: (1) inpatient behavioral health services for adults sold and provided to commercial insurers and their members; and (2) inpatient behavioral health services for adolescents sold and provided to commercial insurers and their members.

29.    Although the Proposed Transaction's likely effect on competition could be analyzed separately for each individual inpatient behavioral health service, it is appropriate to

evaluate the Proposed Transaction's likely effects across the cluster of inpatient behavioral health services because treatment services across different disorders are offered to patients under similar competitive conditions.  Thus, grouping these inpatient behavioral health services into a cluster for analytical convenience enables the efficient evaluation of competitive effects without forfeiting the accuracy of the overall analysis.

30.     Partial hospitalization behavioral health programs and intensive outpatient behavioral health programs are not included in the inpatient behavioral health services market because they do not provide the same level of treatment intensity; thus, commercial insurers and patients cannot substitute these services for inpatient behavioral health services in response to a SSNIP for inpatient behavioral health services.  Additionally, partial hospitalization behavioral health programs and intensive outpatient behavioral health programs are offered by a different set of competitors under different competitive conditions than inpatient behavioral health services.

## C.

### Geographic Market for the Relevant Healthcare Service Markets

31.     For each Healthcare Service Market alleged above, a relevant geographic market in which to analyze the effects of the Proposed Transaction is Rhode Island.

32.     Rhode Island is the main area of competition between Lifespan and CNE for inpatient GAC hospital services and inpatient behavioral health services.  Lifespan and CNE each analyze competition within Rhode Island and identify hospitals within Rhode Island as their competitors.

33.     Rhode Island residents strongly prefer to obtain inpatient GAC hospital services and inpatient behavioral health services close to where they live, with approximately 90 percent

obtaining services from a Rhode Island provider.  Therefore, it would be very difficult for a commercial insurer to market successfully a health plan to Rhode Island employers and residents that excluded all Rhode Island GAC hospitals.  It would also be very difficult for a commercial insurer to market successfully a health plan to Rhode Island employers and residents that excluded all Rhode Island hospitals providing inpatient behavioral health services.

34.     A hypothetical monopolist of inpatient GAC services in Rhode Island—e.g., the entity that would result from the merger of *all* Rhode Island hospitals providing these services—profitably could impose a SSNIP for these services on commercial insurers.  The same is true for a hypothetical monopolist of inpatient behavioral health services in Rhode Island.

35.     Because a hypothetical monopolist of all inpatient GAC hospitals in Rhode Island profitably could impose a SSNIP on insurers, Rhode Island is a relevant geographic market in which to analyze the Proposed Transaction.

36.     A hypothetical monopolist of all hospitals in Rhode Island that provide inpatient behavioral services also profitably could impose a SSNIP on insurers and, thus, Rhode Island is a relevant geographic market in which to analyze the Proposed Transaction.

37.     In the alternative, residents of Rhode Island and the 19 surrounding Massachusetts towns (collectively, the "MARI area") strongly prefer to obtain inpatient GAC hospital services and inpatient behavioral health services close to where they live.  Therefore, it would be very difficult for a commercial insurer to market successfully a health plan to MARI-area employers and residents that excluded all MARI-area GAC hospitals.  It would also be very difficult for a commercial insurer to market successfully a health plan to MARI-area employers and residents that excluded all MARI-area hospitals providing inpatient behavioral health services.

-13-

38.     Because a hypothetical monopolist of all inpatient GAC hospitals in the MARI area profitably could impose a SSNIP on insurers, the MARI area is also a relevant geographic market in which to analyze the Proposed Transaction.

39.     A hypothetical monopolist of all hospitals in the MARI area that provide inpatient behavioral services also profitably could impose a SSNIP on insurers and, thus, the MARI area is a relevant geographic market in which to analyze the Proposed Transaction.

## V.

### THE PROPOSED TRANSACTION IS PRESUMPTIVELY ILLEGAL IN EACH HEALTHCARE SERVICE MARKET

40.     The Proposed Transaction will substantially increase concentration in already highly concentrated markets for inpatient GAC hospital services and inpatient behavioral health services sold to commercial insurers and their members in Rhode Island as well as the MARI area.

41.     Based on commercial inpatient admissions for patients seeking care at Rhode Island hospitals, post-transaction, Defendants would control at least 70 percent of inpatient GAC hospital services and at least 70 percent of inpatient behavioral health services in Rhode Island.

42.     Based on commercial inpatient admissions for patients seeking care at hospitals located in the MARI area, post-transaction, Defendants would control roughly 60 percent of inpatient GAC hospital services and at least 50 percent of inpatient behavioral health services in the MARI area.

43.     The 2010 Merger Guidelines and courts measure concentration using the Herfindahl-Hirschman Index ("HHI").  HHI levels are calculated by totaling the squares of the market shares of each firm in the relevant market.  A relevant market is "highly concentrated" if

it has an HHI level of 2,500 or more. A merger or acquisition is presumed likely to create or enhance market power—and is therefore presumptively illegal—when it would increase the HHI by more than 200 points and result in a post-merger HHI exceeding 2,500.

44.     The Proposed Transaction would increase the HHI in each of the Healthcare Service Markets in Rhode Island by over 1,500 points, resulting in a post-transaction HHI of over 5,000 in each of the relevant Healthcare Service Markets, far exceeding the threshold over which the Proposed Transaction is presumed likely to create or enhance market power and to be presumptively illegal. As such, the Proposed Transaction is presumptively illegal.

45.     The Proposed Transaction would increase the HHI in each of the Healthcare Service Markets in the MARI area by over 1,000 points, resulting in a post-transaction HHI of over 3,000 in each of the relevant Healthcare Service Markets, far exceeding the threshold over which the Proposed Transaction is presumed likely to create or enhance market power and to be presumptively illegal. As such, the Proposed Transaction is presumptively illegal.

## VI.

## ANTICOMPETITIVE EFFECTS IN HEALTHCARE SERVICE MARKETS

### A.

### Competition Between Hospitals Benefits Patients

46.     Competition between hospitals occurs in two distinct but related stages. First, hospitals compete for inclusion in commercial insurers' health plan provider networks. Second, in-network hospitals compete to attract patients, including commercial insurers' health plan members. These dynamics apply to hospital competition for inpatient GAC services and inpatient behavioral health services.

47.     In the first stage of hospital competition, hospitals compete to be included in commercial insurers' health plan provider networks.  To become an "in-network" provider, a hospital negotiates with a commercial insurer and enters into a contract if both sides agree on terms.  The financial terms under which a hospital is reimbursed for services rendered to a health plan's members are a central component of those negotiations.

48.     Health plan members typically pay far less to access in-network hospitals than those that are out-of-network.  In-network status thus benefits hospitals because, all else being equal, an in-network hospital will attract more patients from a particular health plan than an out-of-network one.  This dynamic motivates hospitals to offer lower rates and other more favorable terms to commercial insurers to win inclusion in their networks.

49.     From the insurers' perspective, having hospitals in-network is beneficial because it enables the insurer to create a health plan provider network in a particular geographic area that is attractive to current and prospective members, typically local employers and their employees.

50.     A critical determinant of the relative bargaining positions of a hospital and a commercial insurer during contract negotiations is whether other, nearby comparable hospitals, or combinations of hospitals, are available to the commercial insurer and its health plan members as alternatives in the event of a negotiating impasse.  Alternative comparable hospitals limit a hospital's bargaining leverage and constrain its ability to obtain more favorable reimbursement terms from commercial insurers.  Where there are fewer meaningful alternatives, a hospital will have greater bargaining leverage to demand and obtain higher reimbursement rates and other more favorable reimbursement terms.

51.     A merger between hospitals that are substitutes in the eyes of commercial insurers and their health plan members tends to increase the merged entity's bargaining leverage. Such

mergers lead to higher reimbursement rates by eliminating an available alternative for commercial insurers.

52.     Changes in the reimbursement terms negotiated between a hospital and a commercial insurer, including increases in reimbursement rates, significantly impact the commercial insurer's health plan members.  When hospital rates increase, commercial insurers generally pass on a significant portion of these increased rates to their customers, employers and their employees and individuals, in the form of higher premiums, co-pays, and deductibles.  Customers' employees and individual plan members may bear some portion of the increased cost through increased premiums, co-pays, and deductibles.

53.     In the second stage of hospital competition, hospitals compete to attract patients to their facilities.  Because health plan members often face similar out-of-pocket costs for in-network hospitals, hospitals in the same network compete to attract patients on non-price features, such as quality of care, access to services and technology, reputation, physicians and faculty members, amenities, convenience, and patient satisfaction.  Hospitals compete on these non-price dimensions to attract all patients, regardless of whether they are covered by commercial insurance, a governmental insurance program, or lack any insurance.  A merger of competing hospitals reduces this competition for patients and reduces the merged entity's incentive to improve and maintain service, access, and quality.  As CNE's CEO explained, "███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████" The Proposed Transaction weakens the competitive pressure motivating Defendants to improve their respective service offerings and quality today, and Rhode Islanders will lose their ability to choose between Defendants.

-17-

## B.

### The Proposed Transaction Would Eliminate Beneficial Head-to-Head Competition Between Defendants

54.     Lifespan and CNE compete vigorously and treat each other as "" They compete with one another on rates offered to commercial insurers and they constantly vie to innovate and improve the quality of the care they provide, in direct response to each other.  This competition has spurred Defendants to invest in clinical services, access, and quality, to the benefit of all Rhode Island residents.

55.     Lifespan and CNE also track each other's market shares, quality scores, advertising, and brand recognition, implementing strategies and tactics to win patients from the other.  For example, CNE .  In response, Lifespan

56.     Economic analysis confirms that Lifespan and CNE are close competitors for inpatient GAC hospital services and inpatient behavioral health services.  Diversion analysis, an economic tool that uses data on where patients receive hospital services, shows that if CNE's hospitals were to become unavailable to patients for inpatient GAC hospital services or inpatient behavioral health services, a significant number of those patients would seek care at a Lifespan hospital.  Likewise, if Lifespan hospitals were to become unavailable to patients for inpatient GAC hospital services or inpatient behavioral health services, a significant fraction of Lifespan's patients would seek care at a CNE hospital.

-18-

57.     Today, this close head-to-head competition between the Defendants incentivizes them to keep prices lower and quality of care higher than they would without this competition.

## C.

### The Proposed Transaction Would Increase Defendants' Bargaining Leverage in Negotiations with Insurers

58.     The reduction in competition caused by the Proposed Transaction would increase Defendants' already significant bargaining leverage in contract negotiations with commercial insurers.  This increase in bargaining leverage would apply to contract negotiations for all healthcare services Defendants offer and would result in Defendants commanding higher reimbursement rates and more favorable reimbursement terms.

59.     Defendants serve as key alternatives to one another for most inpatient GAC and inpatient behavioral health services, and Defendants each have added or considered adding services with the express purpose of competing with the other on rates offered to commercial insurers.  Consequently, insurers have achieved more favorable rates and other terms through separate, independent negotiations with each Defendant.

60.     Such competition would be eliminated as a result of the Proposed Transaction, thereby reducing Defendants' incentive to offer lower rates and leading to increased prices. Merging will enhance Defendants' already significant leverage when negotiating with commercial insurers and lead to higher reimbursement rates and terms that are more favorable to Defendants.  Both Defendants also operate accountable care organizations ("ACOs") through which they negotiate with commercial insurers.  The combination of the Defendants' ACOs may provide another avenue through which they can exercise their increased bargaining leverage for

higher rates or more onerous terms that give Defendants less incentive to control healthcare spending and improve quality.

61.     Regulation from the Rhode Island Office of the Health Insurance Commissioner ("OHIC") will not be sufficient to prevent the Defendants from exercising market power after the Proposed Transaction.  OHIC's regulation does not apply to all types of healthcare services or all health insurance products; thus, Defendants can exercise market power through healthcare services or insurers' lines of business that OHIC does not regulate.

### D.

### The Proposed Transaction Would Eliminate Vital Quality and Service Competition

62.     Lifespan and CNE compete with one another to attract patients, which incentivizes them to improve the quality of care they provide, enhance access, recruit high quality physicians, and expand their service offerings.  The Proposed Transaction would eliminate this competition, weakening Defendants' incentives to invest in new or expanded services, innovation, and technology.

63.     Lifespan and CNE track and respond to one another's service offerings.  CNE has added several significant services in direct competition with Lifespan and Lifespan has responded by increasing access to or further promoting its own services.

64.     For example, CNE launched ██████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ CNE emphasized ████████ █████████████████████████████████████████████ █████████████████████████████████████████████ ████████████████████████ Upon starting its ████████████████

███████████ service ████████████████████████████████████████████████

and Defendants continue to compete in this service line today.  In preparing to start performing

███████████, a CNE executive described "████████████████████████████████████

████████████████████████" and noted that "██████████████████████████████████

█████████████████"

66.    Lifespan and CNE have also taken steps to increase patient access to their

respective hospitals to avoid losing patients to one another.  In response to Lifespan's CEO's

instruction that "███████████████████████████" because "████████████████████████

█████" Lifespan ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

66.    Lifespan and CNE also track quality recognitions and considers these

achievements when developing their own strategy.  CNE pursued ████████████████████

██████████████████████████████████████, noting ████████████████████████

██████████████" and that it would "██████████████████████████████████████████

████████████████████████████████"

67.    Lifespan and CNE have competed with one another to employ or affiliate with

physicians, an important source of patient referrals.  CNE███████ pursued ████████████████

███████████████, noting the physician "██████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████" Lifespan began recruiting ██████████████ because

it had a "████████████████████████████████████████████████

████████████████████████████"

68.     Patients benefit from this direct non-price competition.  The Proposed Transaction will diminish the combined firm's incentive to compete on quality of care, access to care, and service offerings to the detriment of all patients who use these hospitals, including commercially insured, Medicare, Medicaid, and self-pay patients.

## VII.

## ENTRY BARRIERS FOR THE RELEVANT HEALTHCARE SERVICE MARKETS

69.     Neither entry by new market participants nor expansion by current market participants is likely to deter or counteract the Proposed Transaction's likely harm to competition for inpatient GAC hospital services or inpatient behavioral health services.

70.     New entry into inpatient GAC hospital services and inpatient behavioral health services or significant expansion by current providers or employers of these services is not likely, nor would such entry or expansion be timely or sufficient to offset the Proposed Transaction's likely harmful competitive effects.  Entry or significant expansion is unlikely due to high costs and risks associated with constructing and opening inpatient GAC or inpatient behavioral health hospitals, or significantly expanding these services.  Construction of a new hospital (including inpatient GAC services and/or inpatient behavioral health services) or substantial expansion of an existing one would involve high costs and significant financial risk, including the time and resources to conduct studies, develop plans, acquire land or repurpose a facility, obtain regulatory approvals, including a CON, and build or renovate and open the facility.

71.     Additionally, Defendants' reputations, size, and breadth and depth of the inpatient GAC hospital services and inpatient behavioral health services they provide make it unlikely that

there will be entry on a sufficient scale to counteract or constrain post-Transaction competitive effects.

72.     Even if *de novo* hospital construction or significant expansion by incumbent providers were likely, such entry or significant expansion would not be timely.  In addition to the time and costs associated with planning and constructing a hospital or significantly expanding existing facilities, Rhode Island's CON regulations pose a significant barrier to entry.

73.     Rhode Island's CON regulations require anyone seeking to build a new hospital or significantly modify an existing hospital to undergo an extensive application process and justify the need for such construction or modifications.  Applicants must demonstrate, among other things, demand and community need and their ability to fund the project.  Obtaining CON approval is a time-consuming process and there is no guarantee such approval will be granted.

74.     Even a successful entrant would be unlikely to counteract the loss of competition resulting from the Proposed Transaction, as a new provider would face significant challenges to replicate CNE's competitive significance and reputation.

## VIII.

## EFFICIENCIES

75.     Defendants have not substantiated merger-specific, verifiable, and cognizable efficiencies that likely would be sufficient to reverse the Proposed Transaction's potential to harm customers in the markets for inpatient GAC services or inpatient behavioral health services.

## IX.

## LIKELIHOOD OF SUCCESS ON THE MERITS, BALANCE OF EQUITIES, AND NEED FOR RELIEF

76.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that a proposed acquisition is unlawful, to seek preliminary injunctive relief to prevent consummation of the acquisition until the Commission has had an opportunity to adjudicate the acquisition's legality in an administrative proceeding.  Section 16 of the Clayton Act, 15 U.S.C. § 26, authorizes the State of Rhode Island to sue for and have injunctive relief to prevent threatened loss or damage from Defendants' consummation of the Proposed Transaction.

77.    In deciding whether to grant relief pursuant to 15 U.S.C. § 53(b), this Court should (1) evaluate the likelihood of the Commission's ultimate success on the merits and (2) balance the equities, both of which weigh in favor of granting the requested injunctive relief. The principal public equity weighing in favor of issuance of preliminary injunctive relief is the public's interest in effective enforcement of the antitrust laws.

78.    Plaintiffs have reason to believe that the Proposed Transaction would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.  In particular, the Commission is likely to succeed in demonstrating in the administrative proceeding, among other things, that:

a.    The Proposed Transaction would have anticompetitive effects in the market for inpatient GAC hospital services, whether evaluated in Rhode Island or the MARI area;

b.      The Proposed Transaction would have anticompetitive effects in the market for inpatient behavioral health services, whether evaluated in Rhode Island or the MARI area;

c.      Substantial and effective entry or expansion into the relevant service and geographic markets is difficult, and would not be timely, likely, or sufficient to offset the anticompetitive effects of the Proposed Transaction; and

d.      The efficiencies that Defendants assert as resulting from the Proposed Transaction are speculative, not merger-specific or cognizable, and are, in any event, unlikely to be sufficient to reverse the Proposed Transaction's potential to harm customers in the relevant markets and thus insufficient to justify the Proposed Transaction.

79.      Preliminary relief is warranted and necessary.  The Commission voted 4-0 to issue an administrative complaint.  Should the Commission rule, after the full administrative trial, that the Proposed Transaction is unlawful, reestablishing the *status quo ante* of competition would be difficult, if not impossible, in the absence of preliminary injunctive relief from this Court.  The integration of Lifespan and CNE's operations, including the implementation of higher prices and potential staff changes, substantially would impair any attempt to restore competition to pre-transaction levels.

80.      In the absence of relief from this Court, substantial harm to competition could occur immediately, including an increase in the costs that employers, their employees, and other individuals incur for their healthcare and a reduction in the quality of healthcare administered. Because any meaningful claimed efficiencies of the Proposed Transaction do not outweigh the

significant interim harm to competition and consumers, the equities weigh strongly in favor of Plaintiffs' request for preliminary injunctive relief.

81.    Accordingly, the equitable relief requested here is in the public interest.

WHEREFORE, Plaintiffs respectfully request that the Court:

a.    Enter the parties' stipulated temporary restraining order;

b.    Preliminarily enjoin Defendants from taking any further steps to consummate the Proposed Transaction, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly;

c.    Retain jurisdiction and maintain the *status quo* until the administrative proceeding, including all appeals, that the Commission has initiated concludes; and

d.    Award such other and further relief as the Court may determine is appropriate, just, and proper.

Dated: February 18, 2022

Of Counsel:

MARK SEIDMAN
(D.C. Bar 980662)
Assistant Director
Mergers IV Division
Federal Trade Commission
Bureau of Competition

ROHAN PAI
(D.C. Bar 1015652)
Deputy Assistant Director
Mergers IV Division
Federal Trade Commission
Bureau of Competition

AMY RITCHIE
NATHAN BRENNER
KENNAN KHATIB
JESSICA MOY
JOSHUA SMITH
ANUSHA SUNKARA
ALBERT TENG
GOLDIE WALKER
CATHLEEN WILLIAMS

*Attorneys*
*Federal Trade Commission*
*Bureau of Competition*

Respectfully Submitted,

/s/ Susan A. Musser
SUSAN A. MUSSER
(D.C. Bar 1531486)
Senior Trial Counsel
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone: (202) 326-2122
Email: smusser@ftc.gov

*Attorney for Plaintiff*
*Federal Trade Commission*

-27-

FOR PLAINTIFF STATE OF RHODE ISLAND

PETER F. NERONHA
Attorney General

By: /s/ Miriam Weizenbaum
MIRIAM WEIZENBAUM (R.I. Bar 5182)
Chief, Civil Division
Office of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 (ex. 2303)
mweizenbaum@riag.ri.gov

STEPHEN N. PROVAZZA (R.I. Bar 10435)
Chief, Consumer & Economic Justice Unit
sprovazza@riag.ri.gov

DANIEL SUTTON *(pro hac vice pending)*
Special Assistant Attorney General
dsutton@riag.ri.gov

*Attorneys for the State of Rhode Island*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 18, 2022, I electronically filed a true and correct copy of the foregoing document using the United States District Court for the District of Rhode Island's CM/ECF System.

I FURTHER CERTIFY that I served the foregoing document on the following counsel via electronic mail:

Joseph A. Farside, Jr.
Locke Lord LLP
One Financial Plaza, Suite 2800
Westminster Street
Providence, RI 02903
Telephone: (401) 455-7648
Email: joseph.farside@lockelord.com

Stephen Murphy
Locke Lord LLP
701 8th Street NW, Suite 500
Washington, D.C. 20001
Telephone: (202) 478-7376
Email: steve.murphy@lockelord.com

Krystle Tadesse
Locke Lord LLP
One Financial Plaza, Suite 2800
Westminster Street
Providence, RI 02903
Telephone: (401) 528-5873
Email: krystle.tadesse@lockelord.com

*Counsel for Defendant Lifespan Corporation*

Stephen Wu
McDermott Will & Emery LLP
444 West Lake Street, Suite 4000
Chicago, IL 60606-0029
Telephone: (312) 984-2180
Email: swu@mwe.com

Nicole Castle
McDermott Will & Emery LLP
One Vanderbilt Avenue
New York, NY 10017-3852
Telephone: (212) 547-5480
Email: ncastle@mwe.com

Daniel Powers
McDermott Will & Emery LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001-1531
Telephone: (202) 756-8131
Email: dgpowers@mwe.com

*Counsel for Defendant Care New England Health System*

/s/ Susan A. Musser
SUSAN A. MUSSER
(D.C. Bar 1531486)
Senior Trial Counsel
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone: (202) 326-2122
Email: smusser@ftc.gov

*Attorney for Plaintiff*
*Federal Trade Commission*